A-588-874<br>
Remand<br>
Court No. 1:23-cv-00108<br>
POR: 10/01/2020 – 09/30/2021<br>
<b>Public Document</b><br>
E&C/OVII: ML

*Optima Steel International, LLC v. United States,*
Court No. 1:23-cv-00108 (CIT August 11, 2023)
Certain Hot-Rolled Steel Flat Products from Japan

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the order of the U.S. Court of International Trade (CIT), issued on August 11, 2023, granting Commerce's request for a voluntary remand.[1] This action arises out of the final results in the 2020-2021 administrative review of the antidumping duty (AD) order on certain hot-rolled steel flat products from Japan covering the period of review (POR) October 1, 2020, through September 30, 2021.[2]

In the *Remand Order*, the CIT granted Commerce's request to treat Tokyo Steel Manufacturing Co., Ltd. (Tokyo Steel) as a mandatory respondent in the administrative review. As discussed below, pursuant to the *Remand Order*, we have considered information submitted on the record, treating Tokyo Steel as a mandatory respondent and calculating an estimated weighted-average dumping margin for Tokyo Steel in this administrative review. As a result, the

---

[1] *See Optima Steel International, LLC v. United States*, Court No. 1:23-cv-00108 (CIT August 11, 2023) (*Remand Order*).
[2] *See Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 FR 28500 (May 4, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

weighted-average dumping margin for Tokyo Steel in the 2020-2021 administrative review is 5.20 percent.

## II.     BACKGROUND

On November 29, 2021, Commerce initiated an administrative review with respect to two producers/exporters of subject merchandise, Nippon Steel Corporation/Nippon Steel Nisshin Co., Ltd./Nippon Steel Trading Corporation (collectively, NSC) and Tokyo Steel.[3] On February 23, 2022, we selected NSC, the producer/exporter accounting for the largest volume of subject merchandise entered during the POR, as the mandatory respondent.[4] On March 4, 2022, Tokyo Steel requested that Commerce reconsider the respondent selection and treat Tokyo Steel as a voluntary respondent.[5] Thereafter, we issued a memorandum in which we determined that Commerce is unable to individually examine Tokyo Steel as a voluntary respondent in this administrative review.[6] On March 18, 2022, Tokyo Steel submitted its section A questionnaire response as a voluntary respondent.[7] On April 15 and 18, 2022 Tokyo Steel submitted its sections B, C, and D questionnaire responses.[8] On August 9, 2023, Optima Steel International LLC (Optima), an importer of Tokyo Steel, challenged Commerce's *Final Results* for Commerce's failure to treat Tokyo Steel as a second mandatory respondent. Commerce requested a remand in order to conduct a review of Tokyo Steel's entries for the 2020-2021

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 67685 (November 29, 2021).
[4] *See* Memorandum "Respondent Selection for the 2020-2021 Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan," dated February 23, 2022.
[5] *See* Tokyo Steel's Letter, "Tokyo Steel's Request for Reconsideration of Respondent Selection and Request for Voluntary Respondent Treatment in the Alternative; Certain Hot-Rolled Steel Flat Products from Japan," dated March 4, 2022.
[6] *See* Memorandum "Respondent Selection for the 2020-2021 Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan," dated April 6, 2022.
[7] *See* Tokyo Steel's Letter, "Tokyo Steel's Section A Questionnaire Response," dated March 18, 2022 (Tokyo Steel's AQR).
[8] *See* Tokyo Steel's Letters, "Tokyo Steel's Section B Questionnaire Response," dated April 15, 2022 (Tokyo Steel's BQR); "Tokyo Steel's Section C Questionnaire Response," dated April 15, 2022 (Tokyo Steel's CQR); and "Tokyo Steel's Section D Questionnaire Response," dated April 18, 2022 (Tokyo Steel's DQR).

review period, which the CIT granted on August 11, 2023. The final results of remand below are the results of that review on remand.

### III.   ANALYSIS

For purposes of these final results of redetermination, we have calculated Tokyo Steel's estimated weighted-average dumping margin for the POR using Tokyo Steel's submitted information on the record as discussed below.

**Discussion of the Methodology**

   A. **Normal Value Comparisons**

Pursuant to section 773(a) of the Act of 1930, as amended (the Act) and 19 CFR 351.414(c)(1) and (d), in order to determine whether Tokyo Steel's sales of subject merchandise were made at less than normal value (NV), Commerce compared the export price (EP) or constructed export price (CEP), as appropriate, to the NV as described in the "Export Price and Constructed Export Price" and "Normal Value" sections, below.

   1. *Determination of Comparison Method*

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average EPs (or CEPs) (*i.e.*, the average-to-average method) unless Commerce determines that another method is appropriate in a particular situation. In less-than-fair-value (LTFV) investigations, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act. Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of administrative reviews,

Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in LTFV investigations.[9]

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[10]  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this remand. Commerce will continue to evaluate its approach in this area based on comments received in this review and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-

---

[9] *See Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286, 1322 (CIT 2014), *aff'd* 862 F. 3d 1337 (Fed. Cir. 2017); and *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363-65 (Fed. Cir. 2015) ("{t}he fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties") (citations omitted).

[10] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

4

average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported (consolidated) customer codes. Regions are defined using the reported destination code (*e.g.*, ZIP, state) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEPs) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group. First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test: small, medium, or large (0.2, 0.5, and 0.8, respectively). Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the

5

difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test. If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage (*i.e.*, the Cohen's *d* test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only. If the difference between the

two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

2. *Results of Tokyo Steel's Differential Pricing Analysis*

For Tokyo Steel, based on the results of the differential pricing analysis, Commerce preliminarily finds that 64.84 percent of the value of U.S. sales pass the Cohen's *d* test,[11] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, Commerce preliminarily determines that there is a meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to all U.S. sales. Thus, for these final results of redetermination, Commerce is applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Tokyo Steel.

---

[11] *See* Memorandum, "Final Remand Results Calculation Memorandum for Tokyo Steel Manufacturing Co., Ltd.," dated concurrently with these final results of redetermination (Tokyo Steel Final Remand Calculation Memorandum).

B. **Date of Sale**

Section 351.401(i) of Commerce's regulations states that, normally, we will use invoice date as recorded in the producer or exporter's records kept in the ordinary course of business, as the date of sale. Furthermore, if the shipment date precedes the invoice date, then Commerce will use the shipment date as the date of sale. The regulation provides that we may use a date other than the invoice date if Commerce is satisfied that a different date better reflects the data on which the material terms of sale are established.[12] Furthermore, if the shipment date precedes the invoice date, then Commerce will use the shipment date as the date of sale.[13]

The CIT has stated that a "party seeking to establish a date of sale other than invoice date bears the burden of producing sufficient evidence to 'satisfy' Commerce that a different date better reflects the date on which the producer or exporter establishes the material terms of sale."[14] The date of sale is generally the date on which the parties establish the material terms of the sale,[15] which normally include the price, quantity, and delivery terms.[16]

Tokyo Steel reported the date of invoice as the date of sale for its home market and U.S. sales. The record indicates that changes in price or quantity occur after the issuance of the purchase order until the issuance of the invoice.[17] Moreover, Tokyo Steel always issued the

---

[12] *See* 19 CFR 351.401(i); *see also Yieh Phui Enterprise Co. v. United States*, 791 F. Supp. 2d 1319 (CIT 2011) (affirming that Commerce may use invoice date unless a party demonstrates that the material terms of its sale were established on another date); and *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090-92 (CIT 2001) (*Allied Tube*).

[13] *See Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 72 FR 52065 (September 12, 2007), and accompanying IDM at Comment 11; *see also Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[14] *See Allied Tube*, 132 F. Supp. 2d at 1090 (brackets and citation omitted).

[15] *See* 19 CFR 351.401(i).

[16] *See USEC Inc. v. United States*, 489 F. Supp. 2d 1337, 1055 (CIT 2007).

[17] *See* Tokyo Steel's BQR at 27; *see also* Toyko Steel's CQR at 23.

invoices in both markets on or before the date of shipment.[18]  Consistent with Commerce's regulations and record evidence, we used the invoice date as the date of sale for both markets.

### C. Product Comparisons

In accordance with section 771(16) of the Act, we considered all products produced and sold by Tokyo Steel in Japan during the POR that fit the description in the scope of order in the *Final Results*, to be foreign like products for purposes of determining appropriate product comparisons to U.S. sales.  We compared U.S. sales to sales made in the home market, where appropriate.  Where there were no sales of identical merchandise in the home market made in the ordinary course of trade to compare to U.S. sales, we compared U.S. sales to sales of the most similar foreign like product made in the ordinary course of trade.

In making product comparisons, we matched foreign like products based on prime versus non-prime merchandise and the physical characteristics reported by Tokyo Steel in the following order of importance:  paint, carbon content, quality, strength, thickness, width, form, pickling, and pattern.  For Tokyo Steel's sales of hot-rolled steel in the United States, the reported control number identifies the characteristics of the hot-rolled steel as exported by Tokyo Steel.

### D. Export Price and Constructed Export Price

Section 772(a) of the Act defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)."  Section 772(b) of the Act defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or

---

[18] *See* Tokyo Steel's BQR at 28; *see also* Tokyo Steel's CQR at 24.

for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)." As explained below, we based the U.S. price on EP for Tokyo Steel.

1. *Treatment of Duties Under Section 232 of the Trade Expansion Act of 1962*

In March 2018, the President exercised his authority under section 232 of the Trade Expansion Act of 1962, as amended, and issued *Proclamation 9705* that mandated, to address national security concerns, imposition of a global tariff of 25 percent on imports of steel articles in order to reduce imports to a level that the Secretary assessed would enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production.[19]

Commerce's treatment of section 232 duties as "United States import duties" and its interpretation of *Proclamation 9705* was recently upheld by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Borusan*.[20] In *Borusan*, the Federal Circuit stated that "the only fair reading of *Proclamation 9705* is that, when applied to an article covered by antidumping duties, the *Proclamation 9705* and antidumping duties must together result in a full imposition of both duties."[21]

Tokyo Steel reported it made its U.S. sales to a Japanese trading company customer, who takes possession of the subject merchandise and arranges all international freight and delivery to its U.S. customer. Thus, Tokyo Steel did not report paying 232 duties on its sales.[22]

---

[19] *See Proclamation 9705 of March 8, 2018; Adjusting Imports of Steel into the United States*, 83 FR 11625 (March 15, 2018) (*Proclamation 9705*).
[20] *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 35 (Fed. Cir. 2023) (*Borusan*).
[21] *Id.*
[22] *See* Tokyo Steel's CQR at Exhibit C-12.

2. *EP*

For Tokyo Steel, we based EP on the price to the first unaffiliated purchaser in the United States. In accordance with section 772(c)(2) of the Act, we made deductions for certain movement expenses, which included, where appropriate, foreign brokerage and handling, and other shipping costs.

**E. Normal Value**

1. *Home Market Viability*

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act. If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

In this review, we determined that the aggregate volume of home market sales of the foreign like product for Tokyo Steel was greater than five percent of the aggregate volume of its U.S. sales of the subject merchandise. Therefore, we used home market sales as the basis for NV for Tokyo Steel, in accordance with section 773(a)(1)(B) of the Act.

2. *Affiliated Party Transactions and Arm's-Length Test*

Commerce may calculate NV based on a sale to an affiliated party only if it is satisfied that the price to the affiliated party is comparable to the price at which sales are made to parties

not affiliated with the exporter or producer, *i.e.*, sales were made at arm's-length prices.[23] Commerce excludes home market prices to affiliated customers that are not made at arm's-length prices from our margin analysis because Commerce considered them to be outside the ordinary course of trade. Consistent with 19 CFR 351.403(c) and (d) and our practice, "Commerce may calculate normal value based on sales to affiliates if satisfied that the transactions were made at arm's length."[24] Tokyo Steel reported it did not have any affiliated party sales.

3. *Level of Trade*

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales. According to 19 CFR 351.412(c)(2), sales are made at different LOTs if they are made at different marketing stages (or their equivalent), and substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[25] In order to determine whether the home market sales are at different marketing stages than the U.S. sales, we examine the distribution chain in each market, including selling functions and customer categories, and the level of selling activities for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs, we consider the starting price before adjustments for EP and home market sales,[26] and the starting price as adjusted under section 772(d) of the Act for CEP sales.[27]

---

[23] *See* 19 CFR 351.403(c).
[24] *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1367 (CIT 2003), *aff'd* 306 F. Supp. 2d 1291 (CIT 2004) (citing *Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 55352, 55355 (September 7, 2011)).
[25] *See Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administration Review and Notice of Intent Not To Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM at Comment 7.
[26] Where NV is based on constructed value (CV), we determine the NV LOT based on the LOT of the sales from which we derive selling expenses, general, and administrative expenses, and profit for CV, where possible. *See* 19 CFR 351.412(c)(1).
[27] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).

When Commerce is unable to match U.S. sales to sales in the home market at the same LOT as the EP or CEP, Commerce may compare the U.S. sale to sales at a different LOT in the home market. In comparing EP or CEP sales at a different LOT in the home market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act. Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of CEP but the data available do not provide a basis to determine whether the difference in LOTs is demonstrated to affect price comparability (*i.e.*, no LOT adjustment is possible), Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[28]

In this remand, Tokyo Steel reported in the home market that it sells merchandise under consideration through three channels of distribution.[29] In channel 1, Tokyo Steel sells to a trading company who then sells the merchandise to distributors or end users. In channel 2, Tokyo Steel sells directly to distributors, and in channel 3, Tokyo Steel sells directly to end users. In connection with all three types of sales, Tokyo Steel performed the following categories of selling functions: sales forecasting, market research, advertising and sales promotion, and order input/processing.[30] Further, Tokyo Steel reported performing essentially the same functions at the same level of intensity for all of its home market sales. On this basis, we preliminarily determine that all home market sales are at the same LOT.[31]

Tokyo Steel reported that it made U.S. sales through an unaffiliated trading company.[32] The selling functions performed were nearly the same as those performed for home market

---

[28] *See OJ from Brazil* IDM at Comment 7.
[29] *See* Tokyo Steel's AQR at 12.
[30] *Id.* at 13 and Exhibit A-8.
[31] *Id.*
[32] *Id.* at 12 and Exhibit A-8.

13

customers. Thus, we find that Tokyo Steel had one channel of distribution in the U.S. market and preliminarily determine that all Tokyo Steel's U.S. sales are made at the same LOT.

We then compared the home market LOT to the U.S. LOT and found that the selling functions Tokyo Steel performed for its home market customers are the same as those performed for its U.S. customers at a similar level of intensity. Moreover, Tokyo Steel stated it is not claiming an LOT adjustment.[33] Therefore, we determine that home market sales and the U.S. sales were made at the same LOT, and that no LOT adjustment is warranted.

4. *Cost of Production Analysis*

In accordance with section 773(b)(2)(A) of the Act, we reviewed cost information from Tokyo Steel to determine whether sales of foreign like product had been made at prices less than the cost of production (COP) of the product.[34] We examined Tokyo Steel's cost data and determine that our quarterly cost methodology is not warranted. Accordingly, we are applying our standard methodology of using annual costs based on the reported data.

a. *Calculation of COP*

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for general and administrative expenses and interest expenses. We relied on the COP data submitted by Tokyo Steel and did not make any cost adjustments.

b. *COP Test*

On a product-specific basis, pursuant to section 773(a)(1)(B)(i) of the Act, we compared the adjusted weighted-average COPs to the home market sales prices of the foreign like product, in order to determine whether the sales prices were below the COPs. For purposes of this

---

[33] *Id.* at 13.
[34] *See* Tokyo Steel's DQR.

comparison, we used COPs exclusive of selling and packing expenses. The prices were exclusive of any applicable billing adjustments, movement charges, actual direct and indirect selling expenses, and packing expenses.

    c.  *Results of the COP Test*

In determining whether to disregard home market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether: (1) within an extended period of time, such sales were made in substantial quantities; and (2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade. In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of a respondent's home market sales of a given product are at prices less than the COP, we do not disregard any below-cost sales of that product because we determine that in such instances the below-cost sales were not made within an extended period of time and in "substantial quantities." Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales because: (1) they were made within an extended period of time in "substantial quantities," in accordance with sections 773(b)(2)(B) and (C) of the Act; and, (2) based on our comparison of prices to the weighted-average COPs for the POR, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that, for certain products, more than 20 percent of sales of certain home market products during the POR were at prices less than the COP and, in addition, such sales did not permit for the recovery of costs within a reasonable period of time. We, therefore, excluded these sales and used the remaining sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

    5. *Calculation of NV Based on Home Market Prices*

We made adjustments to the starting price for billing adjustments and early payment discounts, where appropriate. We also made a deduction from the starting price for certain movement expenses under section 773(a)(6)(B)(ii) of the Act.[35]

In addition, we made adjustments for differences in circumstances of sale, pursuant to section 773(a)(6)(C)(iii) of the Act, by deducting direct selling expenses incurred for home-market sales (*e.g.*, imputed credit) and adding U.S. direct selling expenses (*e.g.*, imputed credit), where appropriate.

We deducted home market packing costs and added U.S. packing costs, in accordance with sections 773(a)(6)(A) and (B) of the Act. When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for differences in costs attributable to differences in the physical characteristics of the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411. We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and subject merchandise.[36]

**F. Currency Conversions**

Where appropriate, we made currency conversions into U.S. dollars, in accordance with section 773A of the Act and 19 CFR 351.415, based on the exchange rates in effect on the date of the U.S. sales as certified by the Federal Reserve Bank.

---

[35] *See* Memorandum, "Draft Remand Results Calculation Memorandum for Tokyo Steel Manufacturing Co., Ltd.," dated January 29, 2024.
[36] *See* 19 CFR 351.411(b).

## IV. INTERESTED PARTY COMMENTS

On January 19, 2024, we issued the draft results of redetermination.[37] We invited interested parties to comment on the draft results of redetermination pursuant to the CIT's *Remand Order*. We received joint comments from Optima and Tokyo Steel which we have addressed below.[38] We received no other comments.

*Optima and Tokyo Steel's Comments:*

- Commerce's calculation of an AD margin for Tokyo Steel contains three clerical errors concerning the beginning and ending dates of the POR. Specifically, the year stated for the beginning of the contemporaneous window period, and the beginning and ending dates of the POR were stated incorrectly as 2021 and 2022, whereas it should be 2020 and 2021.

**Commerce's Position:** We agree with Optima and Tokyo Steel. The POR for this remand is October 1, 2020, through September 30, 2021. The beginning window would, therefore, be July 1, 2020. We have made these corrections in the AD margin program. Consequently, Tokyo Steel's weighted-average margin is revised from the draft results of redetermination to 5.20 percent.[39]

## V. FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, and after considering comments from interested parties, we have calculated Tokyo Steel's estimated weighted-average dumping margin according to the analysis described above, for the 2020-2021 administrative review to be 5.20

---

[37] *See* Draft Results of Redetermination Pursuant to Court Remand, *Optima Steel International, LLC v. United States*, Court No. 1:23-cv-00108 (CIT August 11, 2023), dated January 19, 2024.
[38] *See* Optima and Tokyo Steel's Letter, "Comments on Draft Remand Redetermination of Optima and Tokyo Steel," dated February 1, 2024.
[39] *See* Tokyo Steel Final Remand Calculation Memorandum

17

percent.  Should the CIT affirm these final results of redetermination, we intend to publish a notice of court decision not in harmony with the results of administrative review[40] and notice of amended final results in the *Federal Register*, and issue appropriate instructions to U.S. Customs and Border Protection, consistent with the discussion above.

3/12/2024

X _____

Signed by: RYAN MAJERUS
Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[40] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010)